OPINION OF THE COURT
Edward O. Provenzano, J.
Petitioners commenced this CPLR article 78 proceeding to annul certain determinations of the Medical Review Board of the New York State Commission of Correction. In an unrecorded Bench ruling at Special Term on May 28, 1980, the court granted the petition on the grounds that the Medical Review Board had proceeded arbitrarily and capriciously and in excess of its jurisdiction. This decision is written in connection with that ruling.
Within the Executive Department of this State exists the State Commission of Correction (Commission). (Correction *884 Law, § 41.) Within the Commission is the Correction Medical Review Board (Board), originally created by chapter 906 of the Laws of 1972. The four Board members are appointed by the Governor and are unsalaried but receive necessary expenses. The Board chairman is a member of the Commission, but may not be the Commission chairman. The other members are, respectively, a forensic pathologist, a forensic psychiatrist and an attorney. (Correction Law, § 43.) The functions, powers and duties of the Board are limited. (Correction Law, § 47.) No rules or regulations have been promulgated in connection with the Board’s exercise of its statutory powers and duties. In pertinent part herein, section 47 of the Correction Law empowers the Board to investigate and review the cause and circumstances surrounding the death of any inmate of a correctional facility and thereafter to:
(1) submit a report thereon to the Commission; and
(2) make recommendations (to prevent the recurrence of such deaths) to:
(a) the Commission, and
(b) the administrator of the particular facility.
In the early morning hours of June 4, 1978 a 21-year-old Rochester man was arrested by Rochester City Police officers and was placed in a "lock-up” cell in the City Public Safety Building. It appears that the "lock-up” cell area was manned and patrolled by deputies of the Monroe County Sheriffs Department. Less than four hours after his arrest, and approximately 70 minutes after being placed in the cell, the young man was found hanged (by his trousers) in his cell. The record before the court shows that the young man was highly intoxicated and had demonstrative assaultive, hostile and moody behavior both before and after his arrest. Pursuant to their aforesaid statutory authority, the board undertook to investigate the cause and circumstances surrounding his death.
Presumably as part of their return herein, respondents furnished to the court solely for in camera inspection and review an undated and unsigned "confidential” investigative report, submitted to the Board by one Peter Paravati, an investigator whom the court assumes was not one of the four Board members. Other papers before the court indicate that the said report was prepared and submitted to the Board prior to August 25, 1978. Allegedly because of its confidential nature, the investigative report was not furnished to petitioners’ *885 counsel (who are apparently unaware of its contents). Petitioners did not, however, object to such in camera inspection and consideration by the court.
A 12-page summary of the investigative report, presumably drafted by Paravati, concludes with recommendations that the Board issue three joint "citations” to the Monroe County Sheriff and the Rochester Chief of Police. One of such citations would have indicated a violation of a previously repealed section of the State minimum standards and regulations (concerning constant supervision of certain prisoners). Another would have directed a change of policy with respect to resuscitative efforts during medical emergencies. Neither of those recommendations was followed by the Board.
On October 13, 1978 the Board (through its chairman, Joseph Wasser) issued a two-page document titled "Final Conclusions of the Medical Review Board”, containing conclusions and recommendations. Under the recommendations part, the Board issued two "citations” to petitioner Lombard and the city Police Chief, jointly. In addition to the Sheriff and the Police Chief, the document was addressed and, circulated to the president of the county legislature and tó the District Attorney (but not to the Commission). A copy was also directed to one of the Sheriff’s subordinates. The over-all thrust of that ("Final Conclusions”) document was to the effect that (1) because of the young man’s "abnormal and erratic” behavior, city police officers and/or Sheriff’s deputies should have kept him under constant observation until a psychiatric/mental evaluation could be obtained, (2) they failed to do so, and (3) had they done so, his suicide might have been prevented.
On November 1, 1978 a three-psychiatrist subcommittee of the "Monroe County Jail Health Advisory Committee”[1] concluded, following their own review of the circumstances surrounding the young man’s death, that he had been acting in a manner consistent with a state induced by acute alcohol intoxication; that there was nothing in his behavior to distinguish him from most acutely intoxicated individuals; that he had not been acting in a manner which should have alerted observers that he was a higher suicide risk than anyone else arrested in similar circumstances; that a psychiatric evalua *886 tian was not indicated at the time of his arrest; that, based on what was observed at the time of incarceration, constant observation or supervision did not appear necessary or indicated; and that the suicide did not result from negligence and was unlikely to have been prevented. On November 17, 1978 the full committee unanimously adopted the said findings of the subcommittee, in a resolution signed by its physician chairman.
Leaning chiefly on the conclusions of the said committee, the County Attorney wrote on November 17, 1978 to Commission member Wasser, taking strong objections to 4 of the 6 "Final Conclusions” reached by the Board in its aforesaid document of October 13, 1978 and requesting the Commission to review and to reject those conclusions. There is nothing in the record to show, and the court has no reason to believe, that the other two members of the Commission were ever made aware of the County Attorney’s request.[2]
On July 9, 1979 the Board (through Mr. Wasser, as "Commissioner and Chairman of the Medical Review Board”) issued a five-page document in response to the County Attorney’s objections. In that document, titled "Final Conclusions of the Medical Review Board After Due Consideration on Appeal”, the Board effectively reaffirmed its earlier actions by specifically rejecting each of the objections raised. (The court judicially notes that there is no lawful authority for the exercise of any appellate jurisdiction by the Board.) In so doing, and by way of comparison and contrast, the Board made several references to -its findings and actions in connection with a prior similar investigation involving the death of another inmate at the Monroe County jail. In what appears to be a classic case of "the tail wagging the dog”, the Board noted *887 that (on the prior occasion) it had directed the Commission to develop and administer a particular training program for Monroe County correction officers. The Board further noted that on February 24, 1977 it had "warned” both the Rochester Police Department and the Monroe County Sheriffs Department in writing that obviously intoxicated persons must be seen by a physician prior to being housed in a detention facility.
The Correction Medical Review Board is subsidiary to the State Commission of Correction. The Board possesses no jurisdiction or power other than that granted to it under section 47 of the Correction Law. It is manifest from the statute that the Legislature intended the Board to function solely in an advisory capacity. It has power to investigate. It has a duty to report. It has discretion to make recommendations. Those are the limits of its jurisdiction. It may not formulate policy. It may not issue directives of any kind. It possesses no appellate jurisdiction. It has no disciplinary or accusatory powers. It may not issue citations or otherwise castigate correctional administrators (except as might be appropriate within the confines of its reports to the Commission). It has no authority to publish, circulate or transmit copies of its reports or recommendations beyond that granted under the statute. It has no jurisdiction, beyond the statute, to exercise any power which the Legislature has conferred upon the Commission.
As demonstrated by the facts previously stated herein, the present record is replete with instances of the Board’s actions in excess of its jurisdiction and in abuse of its discretion. There is no need to restate them at this point.
The relief prayed for in the petition is granted. The October 13, 1978 and July 9, 1979 determinations of the respondent Correction Medical Review Board are annulled and the matter is remanded to said respondent for whatever further proceedings are appropriate within its lawful jurisdiction.

. The court does not know whether that committee is a formal or an informal group; under what authority it was formed; when it was formed; the size of the committee; or the nature and extent of the review or investigation undertaken by the subcommittee.

. Further, it does not appear that the Board ever submitted a report to the Commission as was required under section 47 (subd 1, par [d]) of the Correction Law. Although the preamble of the October 13th document contains the wording "whereas, the * * * Commission of Correction having received the recent findings of the * * * Medical Review Board’s inquiry into the death of [the young man]”, the record shows no evidence of such transmittal or receipt. At Special Term, respondents’ counsel stipulated that the papers before the court contained the entire record of the underlying proceedings involving the Board. Admittedly, Mr. Wasser, the Board’s chairman, is one of the three members of the Commission. On the record before it, however, the court has no reason to believe that the other two members of the Commission have ever been made aware of any of the underlying proceedings before the Board. Apparently neither the Commission nor the Board may take any official action, or exercise any power, authority or duty, except through a majority of its members. (See General Construction Law, §§ 41,110.)